# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                                  **Case No. 10-CR-4**

**ADAM LOCKE**
    **Defendant.**

## DECISION AND ORDER

Defendant Adam Locke moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). For the reasons that follow, I deny his motion.

## I. FACTS AND BACKGROUND

This case has a lengthy procedural history. In April 2010, defendant pleaded guilty to armed bank robbery, 18 U.S.C. § 2113(a), (d), and use of a firearm during a crime of violence, 18 U.S.C. § 924(c) (R. 10), but sentencing was repeatedly adjourned as he ran through a series of lawyers and attempted (unsuccessfully) to withdraw his plea (R. 14, 15, 17, 24, 25, 34, 36, 51). In December 2012, Judge Randa sentenced defendant to 105 months on the robbery count followed by 84 months consecutive on the firearm count, for a total of 189 months in prison, running consecutively to several state sentences defendant was then serving. (R. 70.) In January 2014, the Seventh Circuit vacated and remanded the sentence, as Judge Randa mistakenly believed he could not consider defendant's assistance absent a U.S.S.G. § 5K1.1 motion from the government. (R. 102.)

On remand, in July 2014, Judge Randa imposed the same sentence. (R. 113.) In June 2015, the Seventh Circuit remanded again, this time under United States v. Thompson, 777

F.3d 368 (7th Cir. 2015), as Judge Randa did not state his rationale in imposing certain conditions of supervised release. (R. 127.)

On remand, the matter was reassigned to Judge Clevert and then to me. On August 21, 2018, I sentenced defendant to 12 months on the robbery count and 84 months consecutive on the firearm count for a total of 96 months' imprisonment. (R. 166.) He took no appeal from this sentence.

The underlying facts of the case are as follows: On November 21, 2009, defendant robbed the Southern Lakes Credit Union in Racine, Wisconsin. He entered the bank wearing a woman's wig and sunglasses, and carrying a purse. He pulled a silver semi-automatic handgun out of the purse, leapt over the counter, and said, "I want to make a withdrawal." He held the gun to a teller's neck and forced her into an office with another employee. He then forced the other employee into the vault room. The vault was open at the time because the employee was balancing the vault. Defendant asked for a bag and was given a bank bag and black plastic bag. He loaded an entire teller drawer into the plastic bag and then emptied cash out of the vault into the bank bag. He stole about $46,000. (PSR ¶ 9.)

Defendant exited the bank with the money and entered the passenger door of a waiting vehicle. The police received information that the robber fled to the area of an apartment building on Washington Street, and next to a garage at that location they recovered the bank bag, a wig, a purse containing a handgun, and a black plastic bag stuffed inside the purse. The stolen teller drawer was recovered under a nearby bush, and the stolen money was also recovered. (PSR ¶ 10.) Defendant's sister owned the premises on Washington Street. (PSR ¶ 12.)

Thirty-seven years old at the time he appeared before me, defendant had a compiled

2

a fairly significant prior record, including adult convictions for armed robbery in 1997, for which he was sentenced to 10 years in prison, with four subsequent parole revocations (PSR ¶ 36); resisting/obstructing twice in 2003, for which he received sentences of 120 days and 6-½ months jail, respectively (PSR ¶¶ 37-38); and in 2012 marijuana delivery and two bail jumping cases, for which he received prison sentences that discharged in September 2016 (PSR ¶¶ 45-47; R. 131 at 2).

Defendant is currently serving his sentence in this case at USP Leavenworth, with a projected release date of July 15, 2023. He is now 40 years old.

On December 21, 2020, defendant filed a pro se motion for compassionate release. (R. 177.) I referred the matter to Federal Defender Services ("FDS"), pursuant to the court's standing order regarding First Step Act motions (R. 178), but FDS declined to supplement the pro se submission (R. 179). I then directed the government to respond and permitted defendant to reply. (R. 180.) The matter is ready for decision.

## II.  DISCUSSION

**A.     Compassionate Release Standards**

Section 3582(c)(1)(A) authorizes the district court to grant what is commonly known as "compassionate release." The statute provides, in pertinent part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

3

> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i). The statute contains three requirements: (1) the defendant must first make a request to the warden before applying to the court; (2) the defendant must then demonstrate to the court that "extraordinary and compelling reasons" warrant a reduction in his sentence; and (3) the court must determine whether, even if such reasons are shown, a reduction of the sentence would be inconsistent with the applicable 18 U.S.C. § 3553(a) factors. United States v. Cole, No. 08-CR-327, 2021 U.S. Dist. LEXIS 2404, at *5 (E.D. Wis. Jan. 7, 2021).

### 1. Exhaustion

Before 2018, compassionate release required a motion from the BOP. United States v. Sanford, 986 F.3d 779, 781 (7th Cir. 2021). However, the First Step Act of 2018 amended the compassionate release statute to permit the court to adjudicate a motion directly from the defendant—provided, however, that the defendant must first present his request for compassionate release to the warden and exhaust administrative appeals (if the request is denied) or wait 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. Id. at 781-82. The Seventh Circuit has held that, while this "exhaustion" requirement is not jurisdictional, it is a mandatory claim-processing rule which must be enforced if raised by the government. Id. at 782; see also United States v. Williams, 987 F3d 700, 703 (7th Cir. 2021) (holding that "an inmate is required to present the same or similar ground for compassionate release in a request to the Bureau as in a motion to the court").

## 2. Extraordinary and Compelling Reasons

The statute does not define the term "extraordinary and compelling reasons." Rather, Congress instructed the Sentencing Commission, in promulgating general policy statements regarding the sentence modification provisions in § 3582(c)(1)(A), to describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. See 28 U.S.C. § 994(t).[1] The Commission's policy statement provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1)  (A) extraordinary and compelling reasons warrant the reduction . . .
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The commentary to the policy statement indicates that extraordinary and compelling reasons exist under these circumstances:

> (A) Medical Condition of the Defendant.—
>
>     (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life

---

[1] Congress did state that: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Id. Courts have held that "while rehabilitative efforts alone will not support compassionate release, the court may take such efforts into account as part of the analysis." United States v. Anderson, No. 14-CR-186, 2020 U.S. Dist. LEXIS 187983, at *13 (E.D. Wis. Oct. 8, 2020); see also United States v. Hudson, 967 F.3d 605, 613 (7th Cir. 2020) (noting that the court may in deciding a First Step Act motion consider the defendant's post-sentencing conduct as part of the § 3553(a) analysis).

expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

The Commission has not updated the policy statement, which purports to require a motion from the director of the Bureau of Prisons, see U.S.S.G. § 1B1.13 cmt. n.4, since the passage of the First Step Act, which allowed defendants to bring their own motions. Accordingly, "because the Guidelines Manual lacks an applicable policy statement, the trailing

6

paragraph of §3582(c)(1)(A) does not curtail a district judge's discretion." United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020); see also United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

Giving the statutory terms their common meaning, a defendant seeking compassionate release must demonstrate that his situation is extraordinary, i.e., beyond what is usual, customary, or regular, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted. United States v. Scott, 461 F. Supp. 3d 851, 862 (E.D. Wis. 2020); see also Gunn, 980 F.3d at 1180 (noting that the Commission's analysis can guide discretion without being conclusive). In the context of the COVID-19 pandemic, courts have found that modification may be warranted if the prisoner demonstrates that he is particularly vulnerable to the virus based on his age, health status, or other specific circumstances; on the other hand, courts have tended to deny compassionate release requests based on general concerns about possible exposure in prison. E.g., United States v. Dover, No. 14-CR-196, 2020 U.S. Dist. LEXIS 133340, at *16-17 (E.D. Wis. July 28, 2020); see also United States v. Thomas, No. 1:11-CR-22, 2020 U.S. Dist. LEXIS 172963, at *6-7 (N.D. Ind. Sept. 22, 2020) (explaining that § 3582(c)(1)(A) contemplates a sentence reduction based on the particular circumstances of where the defendant is housed and his personal health conditions). Courts often rely on guidance from the CDC in determining whether a prisoner's medical conditions elevate his risk of severe illness. E.g., United States v. Villasenor, No. 03 CR 0689 (-02), 2020 U.S. Dist. LEXIS 228055, at *15 (N.D. Ill. Dec. 4, 2020).

### 3. Section 3553(a) Factors

Finally, if the court decides that extraordinary and compelling reasons have been shown, it must also consider the applicable § 3553(a) factors to determine whether the sentence should be modified. See United States v. Saunders, 986 F.3d 1076, 1078 (7th Cir. 2021) ("Because of the importance of the § 3553(a) factors, courts are not compelled to release every prisoner with extraordinary and compelling health concerns."). Those factors include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the public, and correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a). In some cases, a court may find that the relevant § 3553(a) factors outweigh the extraordinary and compelling reasons warranting compassionate release and/or that release would undermine the goals of the original sentence. United States v. Bartlett, No. 06-CR-273, 2020 U.S. Dist. LEXIS 101393, at *13-14 (E.D. Wis. June 9, 2020).

**B.   Defendant's Motion**

### 1.   Exhaustion

Defendant indicates that the warden denied his request for compassionate on December 4, 2020. (R. 177 at 2, 7.) He contends that because he filed his motion more than 30 days after submitting his request to the warden the court may address the merits of his motion . (R. 177 at 5.) The government agrees the exhaustion requirement is satisfied. (R. 181 at 5.)

8

## 2. Extraordinary and Compelling Reasons

Defendant seeks release based on the COVID-19 pandemic, indicating that he contracted the virus in September 2020 and experienced serious difficulty breathing, severe headaches, pain in his kidneys, shortness of breath, and other symptoms. (R. 177 at 2, 8.) He indicates that USP Leavenworth has more than 500 positive cases, and that he is receiving limited medical care. (R. 177 at 2.) He further contends that, even if the BOP is able to manage his care for this infection, he may be at risk of reinfection if he remains incarcerated at USP Leavenworth.[2] He states that it is an open question whether persons who have recovered obtain any sort of immunity and, if so, for how long, but cases of reinfection have been documented. (R. 177 at 3.)

As defendant notes, courts have granted compassionate release to prisoners with serious medical conditions (R. 177 at 2-3), but defendant does not claim to suffer from any such condition himself. During the pre-sentence interview, defendant denied any history of significant physical health problems or current physical health concerns (PSR ¶ 79), and defendant's prison medical records, submitted by the government, document no significant medical conditions (R. 183 at 1-46).

The records indicate that on May 4, 2020, defendant was seen for a complaint of chest pain, indicating that he suddenly awoke with onset of shortness of breath and chest pain. (R. 181 at 4; R. 183 at 13.) He was not sure if this was related to decreased air flow through his vents or if it was due to his anxiety over the current lock-down conditions. (R. 183 at 13.) His blood pressure at that time was 150/84. (R. 184 at 14.) The provider saw no evidence of

---

[2]In a grievance attached to his motion, defendant argued that prison personnel are not taking proper precautions to keep inmates safe. (R. 177 at 16-20.)

9

exigent cardiac or respiratory emergency, noting possible undiagnosed hypertension and/or anxiety contributing to the event. (R. 183 at 16.) He was advised to decrease his sodium intake until his blood pressure could be re-evaluated. (R. 183 at 16.) At a follow up on May 8, 2020, defendant denied chest pain, shortness of breath, or pedal edema. His blood pressure at that time was 130/87. The provider noted: "He has gained some weight, but has managed to maintain a reasonable blood pressure. Discussed continued work with diet and exercise[.]" (R. 183 at 11-12.) He weighed 225 pounds at that time. (R. 183 at 11.)

Seizing on this evidence, defendant argues in reply that he suffers from hypertension and obesity, which increase his risk. (R. 184 at 7; R. 186 at 11.) While the CDC has indicated that hypertension "possibly" increases the risk from COVID-19,[3] the record contains no definitive diagnosis in this case. Even if it did, courts have generally required more than a mere diagnosis before granting compassionate release based on hypertension alone. See, e.g., United States v. Petersen, No. 3:16-cr-109 (SRU), 2020 U.S. Dist. LEXIS 227353, at *21 (D. Conn. Dec. 3, 2020); see also United States v. Patterson, No. 13-CR-193, 2020 U.S. Dist. LEXIS 205991, at *15-16 (E.D. Wis. Nov. 4, 2020). The record here contains no additional evidence that defendant's blood pressure increases his risk.

The CDC has also indicated that obesity (a BMI over 30) can make it more likely a person will get severely ill from COVID-19.[4] At 6 feet tall and 225 pounds, defendant's BMI is

---

[3]https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited April 2, 2021).

[4]https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited April 2,

10

30.5, just over the threshold. As the CDC has acknowledged, BMI is a notoriously blunt tool with clinical limitations, including its inability to differentiate between excess fat, muscle, and bone mass, and courts have accordingly been skeptical of claims based on BMI alone, absent evidence that the prisoner's weight has caused health problems. See, e.g., United States v. Meyer, No. 14-CR-230, 2020 U.S. Dist. LEXIS 199117, at *20 (E.D. Wis. Oct. 27, 2020). Defendant presents no such evidence here.[5]

Defendant bases his motion primarily on his own COVID case, but the prison medical records contradict his assertions in that regard. While defendant claims to have experienced severe symptoms, the medical records show that his case was largely asymptomatic. He tested positive on 9/19/20 (R. 183 at 37), and during a screening encounter on 9/21/20 he denied any COVID related symptoms (R. 183 at 5). During daily monitoring from 9/21/20-9/27/20, he denied cough, shortness of breath, muscle pain, fatigue, sore throat, headache, congestion, new loss of taste and smell, and/or chills. (R. 183 at 20-21.) On September 22 and 23, 2020, he reported body aches and fever/chills, for which he was given acetaminophen. (R. 183 at 2-3, 21.) It appears that his temperature and pulse oximeter readings were all normal. (R. 183 at 5, 20-21.) By September 27, 2020, his case was noted to be "resolved." (R. 183 at 29.)

In reply, defendant claims that he did experience the severe symptoms alleged in his motion and attached declaration, but the only evidence he presents in support is the lab report

---

2021).

[5]The CDC recently posted a study indicating that patients with a BMI of 30 to 34.9 were only 7% more likely to be hospitalized and 8% more likely to die than people with a healthy weight. See https://www.cdc.gov › mmwr › volume (last visited March 30, 2021).

11

indicating he tested positive (R. 184 at 2; R. 186 at 2), which is not in dispute. He claims that he did tell medical staff about his symptoms during their daily rounds, and that he is not the only inmate whose complains went undocumented. (R. 184 at 2-3.) He cites two notes from September 23, 2020, one of which indicates that he denied certain symptoms, the other noting he reported body aches and fever/chills. (R. 184 at 3; R. 186 at 5, 8.) I see no material contradiction between these notes. Defendant claims that he continued to experience lingering symptoms for the following two months, including irregular heart beat and sharp chest pain (R. 184 at 4), but he presents no further evidence substantiating those claims.

As the government notes, it seems likely that defendant has obtained a degree of immunity after recovering, and vaccination efforts within the BOP are underway.[6] (R. 181 at 8.) I nevertheless acknowledge the possibility that defendant could be reinfected, and that he could experience a more severe case next time. See United States v. Hicks, No. 18-CR-227, 2020 U.S. Dist. LEXIS 213100, at *17 (E.D. Wis. Oct. 7, 2020) ("Given this uncertainty, it would be unwise to adopt a rigid rule, e.g., that a person who has recovered can never demonstrate extraordinary and compelling reasons."). But defendant fails to show that he suffers from any medical conditions making him particularly vulnerable should he be reinfected, the medical evidence shows that prison staff provided appropriate monitoring and defendant's course of recovery from the first infection was uneventful, and defendant presents no medical evidence of lingering symptoms. See id. (indicating that the court should consider "the prisoner's specific medical problems and their severity, the course of his recovery from the virus, whether he

---

[6]As of April 5, 2021, the BOP reports that 132 staff members and 116 inmates are fully inoculated at USP Leavenworth. https://www.bop.gov/coronavirus/ (lasted visited April 5, 2021).

12

displays any lingering symptoms or effects, and the conditions at his particular facility").

Finally, conditions at defendant's facility appear to have improved. As of the date of the government's response, USP Leavenworth reported eight inmate and five staff positives. (R. 181 at 4.) Defendant attaches to his reply a document indicating that Leavenworth was re-initiating quarantine procedures due to rising cases (R. 181 at 4), but as of April 5, 2021, the BOP reports zero inmate and five staff cases.[7]

Defendant thus fails to demonstrate extraordinary and compelling reasons for release. Even if defendant's COVID case was more severe than the medical records suggest, I would deny his motion on review of the § 3553(a) factors.

### 3. Section 3553(a) Factors

Releasing defendant now, after he has served barely half of his prison term, would undermine the goals of the original sentence. Defendant committed an aggravated offense, jumping the counter, holding a gun to the neck of a teller, and ordering an employee into the vault. One of the victim employees indicated in an impact statement that he believed he was going to be shot. (PSR ¶ 15.) Fortunately, no one was injured, and the money was recovered, but a lengthy prison term is needed to provide just punishment in this case. A significant sentence is also needed to protect the public and to deter, given defendant's prior record and poor history on supervision, summarized above.

In reply, defendant indicates that he has expressed remorse for his crime, made efforts to pay restitution (R. 184. at 1), completed rehabilitative programs (R. 184 at 5), and avoided significant discipline (R. 184 at 6). He further indicates that if released he will live with his

---

[7]https://www.bop.gov/coronavirus/ (last visited April 5, 2021). Two inmate deaths are reported from this facility.

13

sister, seek employment in the family cleaning business, and be an asset to the community and his family. (R 184 at 6.) While defendant is to be commended for his using his time well and coming up with a release plan, this cannot overcome the other § 3553(a) factors discussed above.[8] Thus, even if defendant could demonstrate extraordinary and compelling reasons, I would deny his motion under § 3553(a).

### 4. Appointment of Counsel

Defendant seeks appointment of counsel due to the lock-down at his facility, which prevents access to a law library. (R. 177 at 4.) He also complains that he has not been able to access his medical records. (R. 177 at 8, 14.)

There is no right to counsel in a § 3582(c) proceeding, although the court may appoint counsel in the exercise of discretion. United States v. Johnson, 580 F.3d 567, 569 (7th Cir. 2009); United States v. Tidwell, 178 F.3d 946, 949 (7th Cir. 1999). I decline to appoint counsel here.

Defendant's papers demonstrate that he understands the applicable law. He has been able to adequately present his claims, with citation to pertinent authority, despite the conditions at his facility. The government has supplied defendant's medical records, and there is no indication that he lacks access to other pertinent evidence or information.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion for compassionate release (R. 177) is denied.

---

[8]Defendant indicates in reply that he almost lost his mother in December 2019, and that she is 73 years old. (R. 184 at 6.) However, many inmates have elderly parents they would like to see, and defendant does not explain how this makes his situation extraordinary and compelling.

14

**IT IS FURTHER ORDERED** that the government's motion to seal medical records (R. 182) and defendant's motion to seal the attachments to his reply brief (R. 185) are granted.

Dated at Milwaukee, Wisconsin, this 5th day of April, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge